UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RESERVE INTERNATIONAL LIQUIDITY
FUND, LTD.,

                              Interpleader Plaintiff,

              v.

CAXTON INTERNATIONAL LIMITED,
VERISIGN SARL, et al.

                              Defendants.

**ECF CASE**

09 Civ. 9021 (PGG)

**MEMORANDUM OPINION AND
ORDER**

PAUL G. GARDEPHE, U.S.D.J.:

On October 27, 2009, the Reserve International Liquidity Fund (the "Fund") filed

this interpleader action seeking to bring about a final distribution of Fund assets.  On November

2, 2009, the Fund submitted an application to the Court requesting entry of a scheduling order

that would set a timeline for the adjudication of the Fund's application for approval of the

Proposed Final Distribution Plan and Permanent Injunction (the "Plan").[1]  On November 9,

2009, this Court entered an Order to Show Cause directing Defendants Caxton International

Limited and Verisign Sarl to demonstrate why the Fund's proposed scheduling order should not

be entered.

In response to the show cause order, Caxton, Verisign, and the Fund's regulator –

the British Virgin Islands Financial Services Commission (the "FSC")[2] – all made submissions.

The FSC and Caxton support this interpleader action, believing it is the most efficient

---

[1]  On February 25, 2010, State Street Bank & Trust Company, the custodian of the Fund's
remaining assets, filed a motion to intervene.  (Dkt. No. 49)  On March 1, 2010, this Court
ordered any party seeking to oppose State Street's motion to do so by March 8, 2010.  (Dkt. No.
52)  No opposition was filed, and State Street's motion is hereby granted.

[2]  The International Fund is organized under the British Virgin Islands Business Companies Act
of 2004.  (D'Elia Decl. ¶ 2)  The FSC is an independent authority organized under BVI law and
is responsible for regulating and supervising BVI financial services firms.  (FSC Br. 3)

mechanism for distributing the remaining assets of the Fund.  (Caxton Nov. 20 Br. 2-3; FSC Jan. 7 Br. 2-3)  Verisign argues that use of the interpleader statute is not appropriate here.  (Verisign Nov. 20 Br. 1, 7-22)  On January 8, 2010, a hearing was held to address the issues raised in these submissions.  On January 15, 2010, the Fund filed a First Amended Complaint to address issues raised in the submissions and at the January 8 hearing.  (Dkt. No. 33)

On January 20, 2010, this Court received a letter from Geoffrey T. Raicht of McDermott Will & Emery.  (Dkt. No. 34)  Raicht is counsel to Nicholas Carter and David A.K. Walker of Price Waterhouse Coopers (the "Liquidators"), who were appointed liquidators of the Fund by the Honorable Justice Edward Bannister QC of the Commercial Division of the British Virgin Islands Eastern Caribbean Supreme Court (the "BVI Court") on January 18, 2010.  The Liquidators claim to have displaced the Fund's Board of Directors and to now be in a position to direct and control the Fund, including in its role as Interpleader Plaintiff in this action.

On January 21, 2010, this Court entered an order directing all interested parties to submit letters addressing the effect of the appointment of the Liquidators on this interpleader action.  This Court received submissions from the Liquidators, the Fund, Caxton, Verisign and the FSC, as well as from Fund investors Western Union International Limited and TD Ameritrade Holding Corporation.  On February 2, 2010, a hearing was held to address the issues raised in these submissions.

Based on the hearings held in this matter and on the written submissions, and for the reasons set forth below, this Court has determined that (1) the Liquidators do not have standing to assume the position of the Fund's Board in this action, and (2) the Fund has brought a proper interpleader action that will be permitted to proceed.  Accordingly, accompanying this

Opinion is an order setting a schedule for adjudication of the Fund's application for approval of the Plan.

## BACKGROUND

The International Fund is "an offshore, money-market type fund" organized under British Virgin Islands law.  (D'Elia Decl. ¶ 2)  The Fund is managed by a Board of Directors comprised of Bruce R. Bent, Sr., Bruce R. Bent II, and Arthur Bent III.  Reserve Management Company, Inc. ("RMCI") serves as the investment adviser to the Fund, and Resrv Partners, Inc. serves as distributor.  Id.  The Fund is a much smaller sister fund of the Reserve Primary Fund. (Pltf. Nov. 9 Br. 1)

This action arises from the unprecedented collapse of the Reserve Funds, including the International Fund.[3]  The International Fund, like the other Reserve Funds, held debt securities issued by Lehman Bros. Holdings, Inc. ("Lehman").  (First Amended Complaint ("FAC") ¶ 8)  On Sunday, September 14, 2008, Lehman announced that it would file for bankruptcy protection the following day.  Because of their holdings in Lehman paper, on September 15, 2008, the Reserve Funds faced a flood of redemptions. On September 16, 2008, the Board of Directors announced that the International Fund's Net Asset Value ("NAV") had fallen below $1.00 per share.  (FAC ¶ 10)  On September 22, 2008, the Board voted to suspend all redemptions from the Fund.  (FAC ¶ 11)  The drop in the NAV of the Reserve Funds, and the suspension of redemptions, led to the filing of numerous class and individual actions, most of which have been consolidated before this Court.  See In Re: The Reserve Fund Securities and Derivative Litigation, 09 MD 2011.

---

[3]  A more detailed discussion of the events that led to the collapse of the Reserve Funds is set forth in this Court's opinion in SEC v. Reserve Mgmt. Co. Inc., 673 F.Supp.2d 182, 185-90 (S.D.N.Y. 2009).

Caxton filed suit against the International Fund and other parties in New York State Supreme Court, New York County, on October 6, 2008. On November 7, 2008, Justice Kapnick of the New York Supreme Court so ordered the parties' stipulation appointing Denis O'Connor of Alix Partners LLP as "Temporary Supervisor" of the Fund.

Western Union International Limited filed suit against the Fund and others in New York State Supreme Court, New York County, on October 14, 2008. On March 23, 2009, Verisign did the same.

Caxton seeks distribution of the Fund's remaining assets on a pro rata basis. Verisign and Western Union seek distribution of the Fund's remaining assets on a first in, first out ("FIFO") basis under which shareholders would be paid in the order they redeemed, leaving those at the end of the line to bear the full brunt of the losses associated with the Lehman paper.

Defendants in the Caxton, Western Union and Verisign actions filed notices of removal pursuant to 28 U.S.C. §§ 1331 and 1441. All three cases were assigned to this Court pursuant to an order of the Judicial Panel on Multi-District Litigation. Caxton, Western Union and Verisign moved to remand their respective actions to state court pursuant to 28 U.S.C. § 1447. On September 14, 2009, Western Union submitted a notice of voluntary dismissal. Western Union's voluntary dismissal came after the SEC and an overwhelming majority of investors had made submissions in the Reserve Primary Fund action supporting a pro rata distribution of Primary Fund assets. See Reserve Mgmt. Co. Inc., 673 F. Supp. 2d at 190-91.

Two days after filing its notice of voluntary dismissal, Western Union applied to the Commercial Division of the British Virgin Islands Eastern Caribbean Supreme Court seeking the appointment of joint liquidators and the subsequent liquidation of the Fund. (Webster Decl. ¶¶ 4, 7) On January 18, 2010, over the objections of the Fund and the FSC, BVI Justice

Bannister appointed Carter and Walker of Price Waterhouse Coopers as Liquidators of the Fund. In opposing appointment of the liquidators and arguing that this interpleader action would be a more appropriate mechanism for distributing Fund assets, the Fund and the FSC pointed out that nearly all of the Fund's remaining assets are being held by State Street Bank & Trust Company ("State Street") in an account in Boston, Massachusetts. The BVI court nonetheless entered a judgment appointing the liquidators on January 26, 2010. Western Union Int'l Ltd. v. Reserve Int'l Liquidity Fund Ltd., BVIHCV 2009/322, Judgment, 2010: 18 January; 26 January.[4]

On November 3, 2009, this Court issued an Order remanding the Caxton and Verisign actions. In re the Reserve Fund Securities and Derivative Litigation, 09 MD 2011, 2009 WL 3634085 (S.D.N.Y. Nov. 3, 2009). The Caxton and Verisign cases are currently pending before Justice Kapnick of the New York Supreme Court.

Over the past sixteen months, the Fund has distributed most of its remaining assets to shareholders. On January 16, 2009, the Board issued a notice encouraging all shareholders who had not yet submitted redemption requests to do so by 5:00 p.m. on January 26, 2009. (FAC ¶ 16) The Fund thereafter distributed $2.475 billion, or 86% of the Fund's assets as of the close of business on September 15, 2008, to shareholders who placed redemption requests before the January 26, 2009 deadline (and to shareholders whose account balances were below the asset class account minimums for automatic redemption). (FAC ¶¶ 17-22) These distributions were made on a pro rata basis. Id. The Fund's remaining assets continue to be held by State Street. (Feb. 2 Tr. 15)

---

[4]  The BVI Court's decisions are attached to the Liquidators' January 28, 2010 letter as Exhibits B and C. (Dkt. No. 43)

The Fund's interpleader action seeks to bring about a final distribution of Fund assets similar to the pro rata distribution approved and implemented by the Court in connection with the Reserve Primary Fund.[5]

## DISCUSSION

## I.     THE LIQUIDATORS DO NOT HAVE STANDING IN THIS ACTION

### A.     Background

On January 20, 2010, the Liquidators appointed by the BVI Court requested a stay of this action[6] while they undertook to "inform themselves and formally take a position" as to whether or not this action should continue.  (Liquidators Jan. 20 Ltr. 1-2)  The Liquidators stated that under BVI law they had "displaced the Fund's board of directors" and "now direct and control the Fund."  (Liquidators Jan. 20 Ltr. 1)  The Liquidators claimed that Section 175 of the BVI Insolvency Act of 2003 granted them "custody and control of the assets" of the Fund and dictated that the Fund's "directors and other officers . . . cease to have any powers, functions or

---

[5]  The Court's November 25, 2009 Memorandum Opinion and Order concerning the Reserve Primary Fund provided for, inter alia, a pro rata distribution of the remaining assets of the Primary Fund and an injunction barring all claims against (1) Primary Fund assets, including shareholder claims against the Primary Fund; and (2) any of the Defendants and any of the Defendants' officers, directors, trustees, representatives, agents or employees to the extent that such claims are subject to indemnification by the Primary Fund.  Reserve Mgmt. Co. Inc., 673 F.Supp.2d 182.  On January 29, 2010, RMCI reported to the Court that $3.4 billion in Primary Fund assets – representing approximately 99% of the remaining assets of the Primary Fund – were distributed to investors.  See SEC v. Reserve Mgmt. Co. Inc., No. 09 Civ. 4346 (PGG), Dkt. No. 262; Press Release, The Reserve, "Reserve Primary Fund to Distribute $3.4 Billion" (January 26, 2010).   On April 19, 2010, this Court issued an order authorizing the distribution of an additional $215 million in Primary Fund assets to investors.  SEC v. Reserve Mgmt. Co. Inc., No. 09 Civ. 4346 (PGG), Dkt. No. 299.

[6]  The Liquidators asked this Court to "refrain from issuing any opinion or decision until the Liquidators can adequately inform themselves and formally take a position" on whether this action should proceed.  (Liquidators Jan. 20 Ltr. 2)

duties other than those required or permitted under this Part or authorised by the liquidator."
BVI Insolvency Act of 2003, § 175(1)(a), (b).

The Fund opposed the Liquidators' request for a stay and contended that the
appointment of the Liquidators had no legal effect in the United States.  (Fund Jan. 28 Ltr. 1)
The Fund argued that in order to be recognized by this Court, the Liquidators must petition for
and obtain recognition of the BVI liquidation proceeding pursuant to Chapter 15 of the
Bankruptcy Code.  Id.

Although three months have passed since the Liquidators' January 20, 2010 stay
request, they have never taken a position as to whether this interpleader action should proceed.
Instead, the Liquidators and the Fund entered into negotiations concerning what role, if any, the
Liquidators would play in this litigation, and whether they and their counsel could be paid out of
Fund assets.  (Fund Feb. 23 Ltr. 1-2) (Dkt. No. 46)

On February 23, 2010, the Liquidators and the Fund jointly submitted a Proposed
Cross-Border Protocol, outlining terms under which they might cooperate in the distribution of
Fund assets.  (Id.)  The Protocol required the Liquidators and the Fund to seek approval of the
Protocol by this Court and the BVI Court by February 24, 2010.  (Proposed Cross-Border
Protocol at 4) (Dkt. No. 46)

While these negotiations were ongoing, however, the Liquidators – without notice
to the Fund – asked two Cayman Islands banks to freeze $20 million in Fund assets.[7]  See
Liquidators Mar. 5 Ltr. 4; Fund Mar. 5 Ltr. 1.  On March 2, 2010, while this Court was
considering the Proposed Cross-Border Protocol, one of the Cayman Islands banks alerted Fund

---

[7]  The Fund had represented to the Court that all of its assets are deposited at State Street, which
invests the funds in short term notes.  (Fund Mar. 5 Ltr. 3)  The Fund assets held by the Cayman
Islands banks were in the form of short term notes.  (Id.)

counsel to the fact that the Liquidators would be seeking recognition in a Cayman Islands court in an effort to bring an action to seize the funds being held in the Cayman Islands.  (Fund Mar. 5 Ltr. 4)

In an Order dated March 3, 2010, but not entered until March 12, 2010, the BVI Court directed the Liquidators to "spend no further time in seeking approval" of the Cross-Border Protocol.  In the Matter of the Reserve Int'l Liquidity Fund Ltd., BVIHCV 2009/322, Order: 3 March 2010.  The BVI Court directed the Liquidators to "prosecute their application to the Court of Grand Cayman" with "diligence."  (Id.)  On March 5, 2010, the Liquidators informed this Court that they no longer supported the Proposed Cross-Border Protocol. (Liquidators Mar. 5 Ltr. 1)

Because the Liquidators have asserted that they now speak for the Fund – although they have not stated what their position is concerning this litigation – it is necessary for this Court to determine whether the Liquidators should be recognized by this Court.

> **B.**     **The Liquidators Must Seek Recognition Under the Bankruptcy Code**

Chapter 15 of the Bankruptcy Code was enacted in 2005 to "provide effective mechanisms for dealing with cases of cross-border insolvency."  11 U.S.C. § 1501(a)(1)-(5). The statute requires that a "foreign representative" must obtain recognition pursuant to 11 U.S.C. § 1517 – typically by petitioning a bankruptcy court – before he or she "may apply directly to a court in the United States for appropriate relief in that court" and before "a court in the United States shall grant comity or cooperation to the foreign representative."  11 U.S.C. § 1509(a), (b)(2), (b)(3).  "Foreign representative" is defined as "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the

reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).  The Liquidators fall within this definition.

Chapter 15 makes clear that recognition is required before a foreign representative may avail themselves of the federal courts.  "A request for comity or cooperation by a foreign representative in a court in the United States other than the court which granted recognition shall be accompanied by a certified copy of an order granting recognition under section 1517."  11 U.S.C. § 1509(c).  Moreover, should a foreign representative's petition for recognition under Chapter 15 be denied, "the court may issue any appropriate order necessary to prevent the foreign representative from obtaining comity or cooperation from courts in the United States." 11 U.S.C. § 1509(d).

The Liquidators argue that they are not required to seek Chapter 15 recognition in order to assume control of this litigation because, in their view, they are not asking for "comity or cooperation" from this Court.  (Feb. 2 Tr. 5, 7-8)  This Court disagrees.

There is little case law addressing the issue of whether a "foreign representative" may request a stay of U.S. court proceedings involving the entity subject to liquidation in the foreign proceeding.  What case law there is, however, makes clear that foreign representatives must be recognized under Chapter 15 in order to seek a stay from a federal court.  United States v. J.A. Jones Constr. Group, LLC, 333 B.R. 637, 639 (E.D.N.Y. 2005) (finding that the court had "no authority" to consider stay request made by an interim receiver appointed by a Canadian court "in the absence of recognition under [C]hapter 15"); see also Andrus v. Digital Fairway Corp., No. 3:08-CV-119-0 (ROC), 2009 WL 1849981, at *2-3 (N.D. Tex. June 26, 2009) (denying defendant's motion to stay proceedings while a bankruptcy hearing in Canada

proceeded because the fact that there "might be a Chapter 15" proceeding and "there then might be a request for this Court to suspend its proceedings" provided inadequate cause for a stay).

The Liquidators contend that they may circumvent Chapter 15 by simply appearing as the Fund in this action.  To allow such a maneuver would eviscerate Chapter 15's requirements.  A federal court's recognition of representatives appointed in the course of a foreign bankruptcy or liquidation proceeding is a matter of comity – it is an acknowledgement of the validity of the foreign proceeding.  See Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240, 246 (2d Cir. 1999) ("Comity is 'the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.'") (quoting Hilton v. Guyot, 159 U.S. 113 (1895)).  If this Court were to allow the Liquidators to take the place of the Fund Board, such an action would constitute a tacit recognition that the BVI liquidation proceeding is valid and, as a result, the Liquidators are in control of the Fund.  This is precisely the kind of determination that must be made in a Chapter 15 proceeding.  See 11 U.S.C. §§ 1501, 1509.

Chapter 15's legislative history confirms that this Court's recognition of the Liquidators would be inconsistent with the statute.  The House Report states that "chapter 15 is intended to be the exclusive door to ancillary assistance to foreign proceedings" and that "[t]he goal [of Section 1509] is to concentrate control of these questions in one court.  That goal is important in a Federal system like that of the United States with many different courts, state and federal, that may have pending actions involving the debtor or the debtor's property."  H.R. Rep. No. 109-31, at 110-11 (2005).  The House Report goes on to note that under prior law, some courts had:

granted comity suspension or dismissal of cases involving foreign proceedings without requiring a [] petition or even referring to the requirements of that section.  Even if the result is correct in a particular case, the procedure is undesirable, because there is room for abuse of comity.  Parties would be free to avoid the requirements of this chapter and the expert scrutiny of the bankruptcy court by applying directly to a state or Federal court unfamiliar with the statutory requirements.

Id.

If this Court were to acknowledge the Liquidators as in control of the Fund, such recognition would short-circuit any bankruptcy court determination as to whether the BVI liquidation proceeding should be recognized under Chapter 15.  It would also set a precedent that Liquidators appointed in the BVI are "free to avoid the requirements" of Chapter 15.  See id. Such a result is incompatible with Congress' intent in enacting Chapter 15.

Accordingly, before the Liquidators can appear in this action, seek a stay, or intervene on behalf of the Fund, they must obtain recognition under Chapter 15.

## II.    THE REQUIREMENTS FOR STATUTORY INTERPLEADER ARE MET

The Fund brings this interpleader action pursuant to 28 U.S.C. § 1335, which grants district courts original jurisdiction over interpleader actions in which the amount at stake is $500 or more, and the action presents "[t]wo or more adverse claimants, of diverse citizenship" who are claiming or may claim to be entitled to the money or property at issue.  28 U.S.C. § 1335 (2009).  The statute requires that the interpleader plaintiff deposit the money or property "into the registry of the court, there to abide the judgment of the court. . . ."  Id.

Here, all the requirements listed on the face of the statute are satisfied.  The First Amended Complaint pleads that the Fund has received conflicting and adverse claims from investors who are of diverse citizenship.  (FAC ¶¶ 2-4, 28)  The claims against the Fund are adverse in that some investors seek distribution of the Fund's remaining assets on a pro rata basis

11

(e.g., Caxton) while others (e.g., Verisign and Western Union) demand that the assets be distributed on a FIFO basis.  These distribution models are mutually exclusive; the Fund cannot both distribute its assets on a pro rata basis and satisfy Verisign and Western Union's demands that the distribution proceed on a FIFO basis.  The claimants are also of diverse citizenship.  A number of Fund investors are citizens of New York; Caxton is incorporated in the British Virgin Islands, and Verisign is incorporated in Switzerland.  (FAC ¶¶ 2-4, Ex. A)  Moreover, the Fund has agreed to deposit all of its remaining assets – which total approximately $307 million – in the registry of the Court.[8]  (FAC ¶¶ 5, 29; Birch Decl. ¶ 3)

Verisign argues, however, that this interpleader action may not proceed because it concerns multiple claims stemming from multiple obligations owed by the Fund, as opposed to multiple claimants and a "single obligation."[9]  (Verisign Br. 13-18)  For the reasons stated below, the Court concludes that the Fund's remaining assets are properly the subject of an interpleader action.

### A.    Interpleader Jurisdiction is Properly Exercised Where a Stakeholder Faces Claims Based on Mutually Exclusive Theories

Interpleader is "rooted in equity," and is triggered by a "'real and reasonable fear of double liability or vexatious, conflicting claims.'"  Washington Elec. Coop. Inc. v. Paterson,

---

[8]  "[D]eposit has been construed as a requirement of maintaining interpleader jurisdiction, rather than a prerequisite to bringing suit."  William Penn Life Ins. Co. v. Viscuso, 569 F. Supp. 2d 355, 360 (S.D.N.Y. 2008) (citing Citigroup Global Mkts., Inc. v. KLCC Invs., LLC, No. 06 Civ. 5466 (LBS), 2007 WL 102128, at *7 (S.D.N.Y. Jan. 11, 2007); Price & Pierce Int'l, Inc. v. Spicers Int'l Paper Sales, Inc., No. 84 Civ. 3728 (JFK), 1984 WL 635, at *2 (S.D.N.Y. July 16, 1984) ("Practically speaking, deposit is not a prerequisite to obtaining jurisdiction, but rather, a condition of maintaining it. Otherwise, no Court would have the power to even order a fund deposited thereby ensuring its continued control over the matter.")).

[9]  Caxton and Verisign initially raised other objections, including the absence of minimal diversity, plaintiff's refusal to deposit the entire stake with the Court, and improper venue.  (Caxton Br. 6-8; Verisign Br. 7-10)  The Fund amended the Complaint, however, and its changes satisfied these objections.  See FAC ¶¶ 4-6, 29, 33-34; Jan. 8 Tr. 2-4.

Walke & Pratt, P.C., 985 F.2d 677 (2d Cir. 1993) (quoting Indianapolis Colts v. Mayor of

Baltimore, 741 F.2d 954, 957 (7th Cir. 1984), cert. denied, 470 U.S. 1052 (1985)).

"Historically, a bill of interpleader was an equitable device whose purpose was 'the avoidance of

the burden of unnecessary litigation or the risk of loss by the establishment of multiple liability

when only a single obligation is owing.'"  Bradley v. Kochenash, 44 F.3d 166, 168 (2d Cir.

1995) (quoting Texas v. Florida, 306 U.S. 398, 412 (1939)).  Interpleader is designed to prevent

claimants from racing to obtain a judgment, and thereby obtaining

> a disproportionate slice of the fund before . . . fellow claimants [are] able to
> establish their claim.  The difficulties such a race to judgment pose for the
> [stakeholder], and the unfairness which may result to some claimants, were
> among the principal evils the interpleader device was designed to remedy.

State Farm Fire & Casualty Co. v. Tashire, 386 U.S. 523, 533 (1967).  In sum, interpleader

"'insulate[s] a stakeholder from contradictory judgments and multiple liability and . . . relieve[s]

a stakeholder from having to determine which claim among several is meritorious.'"  Weininger

v. Castro, 462 F. Supp.2d 457, 500 (S.D.N.Y. 2006) (quoting John v. Sotheby's, Inc., 141 F.R.D.

29, 33 (S.D.N.Y. 1992)).

        The Supreme Court and Second Circuit have instructed that the interpleader

statute "is remedial and [is] to be liberally construed."  State Farm Fire & Casualty Co., 386 U.S.

at 533; see also Ashton v. Paul, 918 F.2d 1065, 1069 (2d Cir. 1990) (same); William Penn Life

Ins. Co., 569 F. Supp.2d at 359 (same).  Moreover, "'the trend both with regard to statutory

revision and judicial interpretation, has been directed toward increasing the availability of

interpleader and eliminating . . . technical restraints on the device.'"  6247 Atlas Corp. v. Marine

Ins. Co., Ltd., 155 F.R.D. 454, 462 (S.D.N.Y. 1994) (quoting 7 Wright et al., Federal Practice

and Procedure § 1704 at 500-01 (2d ed. 1986)).

Where, as here, a stakeholder faces "claims for designated assets based on mutually exclusive theories," an interpleader action is appropriate.  Ashton, 918 F.2d at 1070; see also Bradley, 44 F.3d at 168-69.  For example, in Ashton, the Second Circuit considered an interpleader action filed by the executors of the R.I. Paul estate.  The executors faced claims from, inter alia, (1) beneficiaries of the estate; (2) a charitable foundation alleging that the estate's assets belonged to the foundation as residuary legatee to an earlier probated estate; and (3) the IRS.  The Second Circuit found that the exercise of interpleader jurisdiction was appropriate because

> the various [interpleader] defendants . . . have clearly asserted claims to the assets of the R.I. Paul Estate based on mutually exclusive theories.  The Foundation and Miller assert claims based on their view that the R.I. Paul Estate's assets are part of the C.M. Paul Estate.  If so, the IRS's claims fail because it concedes that its liens for taxes due on the R.I. Paul Estate cannot attach to funds belonging to the C.M. Paul Estate.  Similarly, if the Foundation prevails, then the beneficiaries of the R.I. Paul Estate . . . stand to receive little or no inheritance.

Ashton, 918 F.2d at 1070.

Interpleader is frequently employed where, as here, a stakeholder faces conflicting claims regarding the appropriate model for distributing a fund's assets.  For example, in Smith v. Widman Trucking & Excavating, Inc., 627 F.2d 792 (7th Cir. 1980), the State of Illinois filed an interpleader action concerning an Illinois Court of Claims judgment, the proceeds of which were deposited into the district court's registry.  Id. at 794-95.  Certain of the interpleader defendants argued for a pro rata distribution, while the Small Business Administration and IRS claimed priority pursuant to the "first in time, first in right" federal common law right of priority rule.  Id. at 799-800.  The Seventh Circuit held that the district court properly exercised interpleader jurisdiction and properly applied the "first in time, first in right" priority rule.  Id.

Similarly, in <u>Great American Ins. Co. v. Spraycraft, Inc.</u>, 844 F. Supp. 1188 (S.D. Ohio 1994), the insurer had paid into the court's registry the proceeds of a property damage insurance policy, claiming that the interpleader defendants had asserted conflicting claims to this fund based on judgments obtained for property damage resulting from Spraycraft's asbestos-containing products. <u>Id.</u> at 1190. Certain of the interpleader defendants argued for a <u>pro</u> <u>rata</u> distribution of the fund, while others contended that the "first in time, first in right" principle applied. <u>Id.</u> at 1191. Noting that "the history of the interpleader statute indicates that its primary intent was to protect stakeholders such as Great American from conflicting claims and multiple liability," the district court found that it had interpleader jurisdiction and applied the "first in time" rule. <u>Id.</u> at 1189, 1191-92.

Likewise in <u>Hebel v. Ebersole</u>, 543 F.2d 14 (7th Cir. 1976), an auction company brought an interpleader action to determine rights to the proceeds of cattle sold at auction. <u>Id.</u> at 16. The district court concluded that it had interpleader jurisdiction and ordered a <u>pro</u> <u>rata</u> distribution. <u>Id.</u> at 17-18. On appeal, the interpleader defendants contended that the <u>pro</u> <u>rata</u> distribution was inappropriate because it was not clear whether certain unsecured creditors had valid claims. <u>Id.</u> at 18. The Court of Appeals determined both that the district court properly exercised interpleader jurisdiction and that the <u>pro</u> <u>rata</u> distribution was appropriate. <u>Id.</u> at 17-18.

In sum, interpleader is commonly employed where a stakeholder faces claims based on mutually exclusive theories and, in particular, where claimants to a common fund disagree as to the appropriate model for distributing the fund's assets.

**B.    The Fund Faces Claims Based on Mutually<br>Exclusive Theories Arising from a Single Obligation**

Verisign argues that the Fund "simultaneously owes obligations to *all* its investors" (Verisign Br. 17) (emphasis in original), and that interpleader is not appropriate where

the interpleader plaintiff owes multiple, independent obligations to claimants.  (Verisign Br. 13-18)  All the investors' claims, however, arise from the Fund's obligations under its governing document, the Articles of Association and Offering Memorandum ("Offering Memorandum").  (Fund Br. 14)  Accordingly, while the Fund clearly faces multiple claims, all of those claims arise from a single obligation:  i.e., the obligation to distribute the Fund's remaining assets in accordance with the terms of the Offering Memorandum.  Moreover, it is apparent that the multiple claims faced by the Fund are mutually exclusive insofar as they propose different approaches to the distribution of the Fund's remaining assets (i.e., pro rata v. FIFO).  Under these circumstances, the exercise of interpleader jurisdiction is appropriate.  None of the cases relied on by Verisign are to the contrary.  Indeed, Verisign has not cited any case to this Court in which interpleader jurisdiction was found inappropriate where multiple claims to a fund arose from a single governing document, whether contract, policy, or prospectus.

In Bradley v. Kochenash, 44 F.3d 166, 168 (2d Cir. 1995), for example, a corporation's board of directors was sued by two different sets of plaintiffs in connection with the corporation's purchase of assets from a privately held entity controlled by the directors.  A shareholder in the purchasing corporation brought a class action claiming that the corporation had paid too high a price for the assets, while creditors of the privately held entity filed a lawsuit claiming that the price paid for the assets was unfairly low.  Id. at 167.  The directors filed an interpleader action contending that they were exposed to a risk of double liability:  the fact finder in the creditors' action might find that the price paid for the assets was too low while the fact finder in the shareholder action might find that the price paid was too high.  Id.  The Second Circuit ruled, however, that interpleader was not available because the directors' potential liability did not flow from a single obligation to claimants with mutually exclusive theories but

16

instead from different obligations to each claimant that could both be resolved against the interpleader plaintiff.  Id. at 168-69.  Because "multiple recoveries would be justifiable in light of the multiplicity of duties owed by [the directors], interpleader was properly denied."  Id. at 169.

> In reaching this result, the Court noted that
>
> it remains true that "[a] prerequisite for permitting interpleader is that two or more claimants must be 'adverse' to each other," Wright, Miller, & Kane § 1705, at 507; see also Hebel v. Ebersole, 543 F.2d 14, 17 (7th Cir. 1976).  The requirement that the claims as to which interpleader is sought be adverse to each other "is not met when . . . the 'stakeholder' may be liable to both claimants."  Wright, Miller, & Kane § 1705, at 507-09.  Thus, the protection against "double or multiple liability" . . . is protection only against double or multiple liability that is unjustifiable because the plaintiff has but a single obligation.

Id. at 168.  Nothing in Bradley supports Verisign's argument that interpleader is inappropriate here.

The directors in Bradley owed separate duties to two very different sets of plaintiffs.  They had a duty to obtain the lowest price on the assets for the shareholders of the corporation of which they were directors, and a separate, distinct duty to obtain the highest price on the same assets for the creditors of the corporation in which they held a controlling interest.  Bradley, 44 F.3d at 168-69; see also Coopers & Lybrand v. Michaels, No. 94 Civ. 5643 (RJD), 1995 WL 860760, at *6 (S.D.N.Y. Oct. 31, 1995).  While the directors undoubtedly labored under a conflict of interest, as the Second Circuit pointed out, the claims against them were not mutually exclusive:  the creditors' "claim that the [assets] purchased by [the corporation] were worth more than the $36.4 million to [the privately held entity] is not necessarily inconsistent with the [shareholder's] claim that they were worth less than that amount to the [corporation]."  Bradley, 44 F.3d at 169.  Because it was "possible that the [interpleader] plaintiffs could be held liable on both sets of claims" – a potential result that flowed from the "multiplicity of duties" they owed to different parties – interpleader was not appropriate.  Id.

17

Here, the Fund owes the same duty to all of its investors, a duty that is governed by the Offering Memorandum.  Moreover, the Fund faces adverse claims based on theories that are mutually exclusive.  The Fund cannot both distribute its assets on a pro rata basis and a FIFO basis.  One method of distribution must be selected.  If interpleader is not granted, the Fund could face conflicting judgments involving different interpretations of the same contract language, resulting in court orders to apply distribution schemes that are entirely inconsistent.

The lower court rulings cited by Verisign are likewise inapposite.  In Bankers Trust Company v. Manufacturers National Bank of Detroit, 139 F.R.D. 302 (S.D.N.Y. 1991), the court dismissed an interpleader complaint where the interpleader plaintiff's action was based on two separate trust agreements with different parties:

> Here, MNB does not itself have any single obligation to only one of two competing claimants.  Rather, MNB faces a situation in which it has inconsistent duties to separate parties under two separate, but related, agreements, and may have breached one agreement by complying with duties under the other.  MNB's potential liability in this suit arises because MNB chose to comply with its supposed obligation to Ford under the Owners Trust Agreement to terminate the Management Agreement instead of complying with its separate obligation to Bankers Trust under the Equipment Trust Agreement to continue the Management Agreement.  Instead of multiple liability on a single obligation, MNB actually faces multiple liability on multiple obligations.  Because this situation does not come within the scope of rule interpleader, the interpleader complaint must be dismissed.

Id. at 308.

Similarly, in Nevada v. Pioneer Companies, Inc., 245 F. Supp. 2d 1120 (D. Nev. 2003), interpleader was found inappropriate where the stakeholder's liability arose from a variety of contractual relationships it had entered into, resulting in "competing obligations."  In that case, the Colorado River Commission of Nevada ("CRCN") filed an interpleader action in which it named as defendants Pioneer Companies – a manufacturing concern to which it sold electrical power – and a variety of energy and energy trading companies from which it had purchased

18

electrical power on Pioneer's behalf.  In its complaint, CRCN alleged that it was holding cash

and other assets of Pioneer – which had filed a Chapter 11 proceeding – that Pioneer and the

power companies had made competing claims against these assets, and that the assets in hand

were not sufficient to pay all the competing claims.  Id. at 1123-24.  The court concluded that

interpleader was not appropriate because CRCN's liability arose "from multiple, competing

obligations CRCN voluntarily made with a number of companies."  Id. at 1128.  Here, once

again, the Fund's obligations to its shareholders arise from a single governing document – the

Offering Memorandum.

       Because the Fund faces adverse claims based on mutually exclusive theories that

arise from a single obligation, the exercise of interpleader jurisdiction is appropriate under

Bradley, Ashton, and the other authorities cited above.

## III.    THIS COURT HAS THE POWER TO GRANT THE INJUNCTIVE RELIEF SOUGHT BY THE FUND

       In its brief responding to the order to show cause, Verisign argues that the

exercise of interpleader jurisdiction is inappropriate here because the Court lacks the power to

issue a permanent injunction against claims for indemnifiable conduct, which is part of the relief

the Fund seeks.[10]  Verisign argues that this Court could not provide effective injunctive relief

because most of the Fund's investors are foreign individuals or entities.  (Verisign Br. 20-21; see

also FAC Ex. C at 1-2)

---

[10]  Verisign appears to have abandoned this objection at oral argument.  Because Verisign
withdrew a number of its objections to interpleader based on the Fund's submission of an
amended complaint, at the January 8, 2010 hearing, the Court asked Verisign's counsel to list the
objections it continued to press.  Counsel made reference to only the multiple obligations
argument and his contention that this Court should defer to the BVI liquidation proceedings.
(Jan. 8 Tr. 2-5)

The injunction sought by the Fund, if granted, would be issued pursuant to 28 U.S.C. § 2361, which permits a district court overseeing an interpleader action to "issue its process for all claimants and enter its order restraining them from instituting or prosecuting any proceeding in any State or United States court affecting the property, instrument or obligation involved in the interpleader action until further order of the court."  28 U.S.C. § 2361 (2009). This statute provides for nationwide service of process.

A number of courts imposing injunctions in interpleader actions have applied 28 U.S.C. § 1655, the federal lien statute, to address issues of service of process on claimants located outside the United States.  See, e.g., Krishna v. Colgate Palmolive Co., No. 90 Civ. 4116 (CSH), 1991 WL 125186, at *9-13 (S.D.N.Y. July 2, 1991); Bache Halsey Stuart Shields, Inc. v. Garmaise, 519 F. Supp. 682, 685-87 (S.D.N.Y. 1981); United States v. Estate of Swan, 441 F.2d 1082, 1085-86 (5th Cir. 1971); Guy v. Citizens Fidelity Bank & Trust Co., 429 F.2d 828, 832-33 (6th Cir. 1970).  Section 1655 provides that where "a defendant cannot be served within the district, or does not voluntarily appear, the Court may direct such appearance and direct service upon him wherever found, by personal service if practicable."  Bache Halsey Stuart Shields, 519 F. Supp. at 686.

Citing First African Trust Bank, Ltd. v. Bankers Trust Co., No. 94 Civ. 4995 (RPP), 1995 WL 422269 (S.D.N.Y. July 14, 1995), however, Verisign contends that 28 U.S.C. § 1655 does not apply to interpleader actions.  In that case, the court noted that the applicability of Section 1655 "to an interpleader action brought by a disinterested stakeholder remains an open question."  Id. at *4, 5 n.6.

Courts have differed on this issue.  The court in Wilson v. Canada Life Assur. Co., No. 4:08-CV-1258 (JEJ), 2009 WL 532830, at *10, n.12 (M.D. Pa. Mar. 3, 2009), stated in

dicta that the use of Section 1655 in interpleader actions is inappropriate, because interpleader

actions are in personam proceedings, New York Life Ins. Co. v. Dunlevy, 241 U.S. 518, 520-22

(1916), while Section 1655 relies on in rem jurisdiction.  See Wilson, 2009 WL 532830, at *10,

n.12.  Courts applying Section 1655 to interpleader actions have found that the notice provisions

of the statute are sufficient to address the due process concerns outlined in Dunlevy, however,

and have noted that Dunlevy addressed an interpleader action brought under Pennsylvania law,

and is thus "inapposite in a federal statutory interpleader action."[11]  See Estate of Swan, 441 F.2d

at 1086.

   Moreover, as Judge Weinfeld noted in Bache Halsey Stuart Shields, "the policy of

interpleader supports [the] view" that 28 U.S.C. § 1655 is applicable to interpleader actions.  519

F. Supp. at 686.  In that case, the court found that a New York brokerage house seeking

interpleader relief presented a "particularly cogent" example of why Section 1655 should be

applied to interpleader actions.  Id.  "To deny interpleader relief to such a stakeholder presages a

burgeoning problem whereby persons, however widely dispersed in foreign lands, could take

advantage of the financial expertise available in New York without protecting the New York

---

[11]  Commentators have noted that "[t]he effect of the Dunlevy holding has been diminished in recent years by the deterioration of the distinctions between actions in personam and actions in rem.  Insofar as modern notions of jurisdiction require only that due process be satisfied to enable an action to proceed, the characterization of interpleader as in personam or in rem has little validity."  7 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1711 (3d ed. 2009).  Given that interpleader actions are designed to determine the validity of competing claims to an identifiable stake, interpleader "is almost indistinguishable from other in rem or quasi-in-rem proceedings.  Furthermore, at the time the Supreme Court decided Dunlevy, it had only two options—it could label interpleader in personam and require personal service or it could label interpleader in rem, in which case service by publication might have been thought sufficient.  In view of the interstate aspects of many interpleader actions and the unlikelihood that publication would give actual notice to the claimants, it is not surprising that the Court chose the in personam label.  Time has changed the law's attitude toward notice, however.  Section 1655, for example, contains a reasonable-notice-giving provision and requires that notice be given personally whenever possible."  Id.

financial institutions when disputes arise as to the ownership of assets placed in their charge."

Id.  Similarly, it would be inappropriate to bar the Fund – which is operated in New York and

which maintains the vast bulk of its assets in the United States – from seeking interpleader relief

merely because many of its investors reside outside the United States.[12]

## IV.    THIS COURT WILL NOT ABSTAIN FROM EXERCISING JURISDICTION IN FAVOR OF LIQUIDATION PROCEEDINGS IN THE BRITISH VIRGIN ISLANDS

Verisign also argues that this Court should abstain from exercising jurisdiction

over this action "in deference to" the BVI liquidation proceeding.  (Verisign Br. 10-13)

"The mere existence of parallel foreign proceedings does not negate the district

courts' 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'"  Royal &

Sun Alliance Ins. Co. of Can. v. Century Int'l Arms, Inc., 466 F.3d 88, 92 (2d Cir. 2006) (quoting

Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976)).  The

Second Circuit has made clear, however, that foreign bankruptcy proceedings are, for the most

part, an exception to this rule.  "[O]ne discrete category of foreign litigation [] generally requires

the dismissal of parallel district court actions – foreign bankruptcy proceedings.  A foreign

nation's interest in the 'equitable and orderly distribution of a debtor's property' is an interest

deserving of particular respect and deference, and accordingly we have followed the general

practice of American courts and regularly deferred to such actions."  Royal & Sun Alliance Ins.

Co. of Can., 466 F.3d at 92-93.

---

[12] In its written submission, Verisign also argued that this Court does not have the authority to take in and direct the distribution of the Fund's assets because the FSC has issued a directive prohibiting the Fund from distributing its assets to any other party without the FSC's authorization.  (Verisign Br. 21-22)  The FSC has since made clear that is supports the distribution of Fund assets through this interpleader action.  (FSC Br. 1-3)  Accordingly, Verisign's objection on this ground is moot.

Deference to foreign bankruptcy proceedings is appropriate, however, only where "the foreign proceedings are procedurally fair and . . . do not contravene the laws or public policy of the United States." JP Morgan Chase Bank v. Altos Hornos De Mexico, S.A. De C.V., 412 F.3d 418, 424 (2d Cir. 2005); see also Finanz AG Zurich, 192 F.3d at 246.  The burden is on the party urging the district court to defer to a foreign proceeding as a matter of comity – here, Verisign – to prove that comity is appropriate.  See Allstate Life Ins. Co. v. Linter Group, Ltd., 994 F.2d 996, 999 (2d Cir. 1993).

Deference to the BVI liquidation proceeding is inappropriate here because this nation has a strong public policy interest in an orderly, efficient and equitable distribution of the Fund's assets, and such a distribution is unlikely to be realized in the BVI proceedings.[13]  As discussed above, in order for the liquidators appointed in the BVI proceeding to obtain the assistance of the U.S. courts – assistance that will be required to intervene in suits brought by Fund investors in U.S. courts and to obtain access to Fund assets – they must be recognized under Chapter 15.  See 11 U.S.C. § 1509(b), (c), (d).  The case law indicates that such recognition is not likely to be granted, a reality acknowledged by the BVI court itself, as well as by the FSC.  See Western Union Int'l Ltd., BVIHCV 2009/322, at ¶ 42; Liquidators Jan. 28 Ltr. Ex. C at ¶ 42; FSC Br. 2.

Under Chapter 15, a foreign representative may obtain recognition of a foreign proceeding as either a foreign main or non-main proceeding. 11 U.S.C. § 1517(a)(1). A foreign main proceeding is defined as a "foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4).  A foreign non-main proceeding is any

---

[13]  It is worth noting that investors holding approximately 33.14% of the Fund's remaining equity – as well as the Fund's BVI regulator – join in the Fund's request that distribution of the Fund's assets be overseen by this Court as part of the instant interpleader action.  (Jan. 28 Fund Ltr. 1-2; Jan. 28 FSC Ltr. 1-2)

other proceeding "pending in a country where the debtor has an establishment." 11 U.S.C.

§ 1502(5). "Establishment" is defined as "any place of operations where the debtor carries out a

nontransitory economic activity." 11 U.S.C. § 1502(2).

        In <u>In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.</u>,

374 B.R. 122 (Bankr. S.D.N.Y. 2007), <u>aff'd</u>, 389 B.R. 325 (2008), the court considered and

rejected the unopposed application of joint provisional liquidators appointed by a Cayman

Islands court for recognition of the Cayman Islands proceeding under Chapter 15.[14]  In

determining that the Cayman Islands proceeding was not a "foreign main proceeding," the court

relied on the fact that "the only adhesive connections" the Bear Stearns Funds had had with the

Cayman Islands was that "they are registered there."  <u>In re Bear Stearns</u>, 374 B.R. at 129-30.

The court went on to note that the Funds had

> no employees or managers in the Cayman Islands, the investment
> manager for the Funds is located in New York, the Administrator
> that runs the back-office operations of the Funds is in the United
> States along with the Funds' books and records and prior to the
> commencement of the Foreign Proceeding, all of the Funds' liquid
> assets were located in the United States.

<u>Id.</u> at 130.  In light of these facts, the court held that the Cayman Islands was not the center of the

Funds' main interests, and thus, the Cayman Islands liquidation proceeding was not a foreign

main proceeding under Chapter 15.  <u>Id.</u> at 127-31.

        The court also held that the Cayman Islands liquidation proceeding was not a

foreign non-main proceeding under Chapter 15.  <u>Id.</u> at 131-32.  Because the Funds did not have

an "establishment" in the Cayman Islands for the conduct of non-transitory economic activity –

---

[14]  Judge Lifland, the author of <u>In re Bear Stearns High-Grade Structured Credit Strategies</u>
<u>Master Fund, Ltd.</u>, was one of the authors of Chapter 15 and the Model Law upon which it was
based.  <u>In re Bear Stearns</u>, 374 B.R. at 127 n. 3.

essentially, "a local place of business" – the Cayman Islands proceeding did not meet the definition of a non-main proceeding.  Id. at 131.

Here, the Liquidators have not sought Chapter 15 recognition of the BVI liquidation proceeding, but should they seek such recognition, the court addressing their request would encounter facts strikingly similar to those in In re Bear Stearns.  The Fund's only contact with the BVI is that it is incorporated there.  As the BVI court acknowledged, "[t]he management of the group [of Reserve Funds, including the International Fund] was carried out in New York.  The Company conducted no business within the BVI and had no assets here.  Its remaining funds, amounting to some US $307 million, are currently held in a bank in Boston, Mass."  Western Union Int'l Ltd., BVIHCV 2009/322, at ¶ 3; Liquidators Jan. 28 Ltr. Ex. C at ¶ 3.  Given these facts, the BVI liquidation proceeding is unlikely to be recognized as either a foreign main or foreign non-main proceeding under Chapter 15.  See In re Bear Stearns, 374 B.R. at 127-31.

The BVI court has recognized that "the prospects of liquidators appointed in this Court obtaining recognition and assistance from the US Bankruptcy Court are negligible or worse," given that the facts of this case and In re Bear Stearns are "indistinguishable."[15]

---

[15]  Despite this clear statement by the court that appointed them, the Liquidators attempt to argue that Chapter 15 recognition may be granted to the BVI liquidation proceeding in light of In re Saad Investments Finance Co. (No. 5), Ltd., No. 09-13985 (KG) (Bankr. D. Del. Dec. 17, 2009) (Dkt. No. 47), a recent Delaware bankruptcy court decision.  (Feb. 2 Tr. 9-10)  In that case, the court recognized a Cayman Islands proceeding as a foreign main proceeding under Chapter 15.  That case is easily distinguished, however, because Saad Investments' operations were – at the time of the petition – conducted almost exclusively in the Cayman Islands, its management resided in the Cayman Islands, and more of its assets were held in the Cayman Islands than in any other country.  See In re Saad, Cayman Islands Liquidators Br. ¶ 48 (Dkt. No. 4).  Moreover, the Cayman Islands liquidators' application appears to have been unopposed, while the Fund and a number of investors would likely oppose recognition of the Liquidators here.  See In re Saad Investments Finance Co. (No. 5), Ltd., No. 09-13985 (KG), at 1 (Bankr. D. Del. Dec. 17, 2009) (Dkt. No. 47).

<u>Western Union Int'l Ltd.</u>, BVIHCV 2009/322, at ¶ 42; Liquidators Jan. 28 Ltr. Ex. C at ¶ 42.

Moreover, the FSC, the Fund's regulator, has acknowledged that "there likely would be substantial questions regarding the ultimate enforceability in the United States – where the Fund's assets and its managers are located – of orders respecting the Fund that might be rendered by a BVI court, including in the pending Western Union Action."  FSC Br. 2; <u>see also</u> <u>Western Union Int'l Ltd.</u>, BVIHCV 2009/322, at ¶ 42; Liquidators Jan. 28 Ltr. Ex. C at ¶ 42.

Verisign and the Liquidators argue, however, that Chapter 15 recognition of the BVI proceeding is not necessary for the Liquidators to effect distribution of the Fund's assets. (Jan. 8 Tr. 10-11; Feb. 2 Tr. 8-9)  They contend that the Liquidators may bring an action against State Street to recover the Fund's assets pursuant to the exception outlined in 11 U.S.C. § 1509(f), which provides that a foreign representative is not required to be recognized under Chapter 15 in order to "sue in a court in the United States to collect or recover a claim which is the property of the debtor."[16]  <u>Id.</u>  This argument is untenable.

"The legislative history of [Chapter 15] indicates that this exception is to be narrowly applied."  <u>In re Loy</u>, 380 B.R. 154, 165 (Bankr. E.D. Va. 2007).  The House Report on the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which codified Chapter 15, notes that § 1509(f) "provides a limited exception to the prior recognition requirement so that collection of a claim which is property of the debtor, for example an account receivable, by a foreign representative may proceed without commencement of a case or recognition under this chapter."  H. Rep. 109-31(I) at 110-11 (2005).

---

[16]  Verisign originally argued that the Liquidators would simply approach State Street, inform the bank of their appointment by the BVI court, and be handed the Fund's holdings.  (Jan. 8 Tr. 10)  State Street has represented to the Fund, however, that it will not release Fund assets absent a court order, and the Bank has moved to intervene in this interpleader action.  (Fund Jan. 28 Ltr. 4; State Street Notice of Motion (Dkt. No. 49) )  Given the competing claims regarding control of the Fund, State Street's assertion is both logical and credible.

Given the restricted nature of Section 1509(f), it is doubtful that the Liquidators could institute a lawsuit against State Street to recover the Fund's remaining assets under this provision. Indeed, such a lawsuit does not appear in any way analogous to an action to recover an account receivable. In any event, a suit by the Liquidators to recover the Fund's assets would no doubt be opposed by the Fund and by certain of its investors and, given the difficult legal issues posed by such a suit, would take time to resolve. This would run contrary to the public policy interest of the United States in an efficient and orderly distribution of the Fund's assets.

Separate and apart from the Chapter 15 considerations, it does not appear that the BVI liquidation proceeding will afford sufficient procedural protections to Fund investors. Indeed, the BVI court has already determined that a FIFO distribution is the only appropriate method for distributing the Fund's remaining assets. Western Union Int'l Ltd., BVIHCV 2009/322, at ¶ 48; Liquidators Jan. 28 Ltr. Ex. C at ¶ 48. The BVI court made this determination, however, without giving Fund investors notice or an opportunity to be heard. This Court, in the course of these interpleader proceedings, will do precisely that, mirroring the efforts made in the distribution of the Reserve Primary Fund assets. See Reserve Mgmt. Co. Inc., 673 F. Supp. 2d at 190-94. This Court will not order any distribution of Fund assets without ensuring that all investors have an opportunity to be heard concerning a proposed plan of distribution.

## CONCLUSION

For the reasons set forth above, this interpleader action will proceed, and State

Street's motion to intervene is granted. The Fund, in conjunction with State Street, should

deposit all Fund assets within its control in this Court's registry by May 7, 2010. An order

setting a schedule for adjudication of the Fund's Application for approval of the Proposed Final

Distribution Plan and Permanent Injunction will be issued in due course.

The Clerk of the Court is directed to terminate the following motion: Docket No.

49.

Dated: New York, New York
       April 28, 2010                     SO ORDERED.

                                          Paul G. Gardephe
                                          United States District Judge

28