**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | : | |
| RESERVE INTERNATIONAL LIQUIDITY FUND LTD., | : | 09-CV-9021 (PGG) |
| | : | |
| Interpleader Plaintiff, | : | |
| v. | : | |
| | : | |
| CAXTON INTERNATIONAL LIMITED, VERISIGN SARL, et al. | : | |
| | : | |
| Defendants. | : | |

**RESERVE INTERNATIONAL LIQUIDITY FUND LTD.'S REPLY TO
RESPONSES TO FUND'S APPLICATION FOR APPROVAL OF PROPOSED
FINAL DISTRIBUTION PLAN AND PERMANENT INJUNCTION**

DUANE MORRIS LLP
John Dellaportas
Fran M. Jacobs
1540 Broadway
New York, NY 10036
Tel: (212) 692-1012
*Attorneys for Interpleader
Plaintiff Reserve International
Liquidity Fund Ltd.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

I.    INTRODUCTION ................................................................................................1

II.   DISTRIBUTION METHODOLOGY ...............................................................2

III.  PERMANENT INJUNCTION ...........................................................................3

    A.   The Entire Plan Is Premised On A Permanent Injunction That Enjoins All
        Indemnifiable Claims .............................................................................................4

    B.   The Issue Of A Possible Shareholder Vote To Extend the Injunction Is Not Ripe ..........5

    C.   State Street's Proposed Modifications To The Permanent Injunction Are
        Unnecessary And Inappropriate .............................................................................6

IV.   EXPENSE FUND .................................................................................................7

    A.   The Fund's Governing Documents And British Virgin Islands Insolvency Law
        Both Expressly Require An Expense Fund .................................................................8

    B.   $25 Million Is An Appropriate Initial Amount For The Expense Fund .........................12

V.    REQUEST FOR MEDIATION ..........................................................................14

i

# TABLE OF AUTHORITIES

**Cases**

*Brewer v. Village of Old Field*,
    311 F. Supp. 2d 382 (E.D.N.Y. 2004) .................................................................10

*Midland Sav. & Loan v. Dunmire*,
    68 F.2d 249 (10th Cir. 1933) ...........................................................................12

*SEC v. Reserve*,
    09 Civ. 4346................................................................................... *passim*


**Statutes and Rules**

28 U.S.C. §1651(a) .............................................................................................4

28 U.S.C. § 2361 ...............................................................................................4

U.S. Bankruptcy Code Chapter 15.........................................................................3

Local Civil Rule 83.12(e) ....................................................................................15


**Other Authorities**

British Virgin Islands Business Companies Act of 2004....................................................11

British Virgin Islands Insolvency Rule § 191(1) (2005) ........................................... 10-11

Pursuant to the May 4, 2010 Order of this Court, interpleader plaintiff Reserve International Liquidity Fund Ltd. (the "Fund") respectfully submits this reply to the responses to the Fund's application for approval of its Proposed Final Distribution Plan and Permanent Injunction (the "Plan").

## I.  INTRODUCTION

In accepting interpleader jurisdiction over this matter, the Court stated that it would "not order any distribution of Fund assets without ensuring that all investors have an opportunity to be heard concerning a proposed plan of distribution." (Dkt. #69 at 27.)  That benchmark has been met.  On July 1, 2010, some thirty investors representing over 55% of outstanding equity in the Fund made submissions or joinders. (*See* Birch Decl. ¶ 2; Dkt. #105-28.)  The Fund's regulator – the British Virgin Islands Financial Services Commission (the "FSC") – and custodian – State Street Bank and Trust Company ("State Street") – have also filed submissions.[1] (Dkt. #119, 105.) Except for certain limited issues (addressed below), the Plan has received overwhelming support from the Fund's investors, as well as that of the FSC.  Only Western Union and VeriSign oppose it outright.  By contrast, more than 85% of Fund investors support or do not object to the Plan – higher than for the comparable Primary Fund plan. (*See* Birch Decl. ¶ 2.)

We respectfully submit that such support is well-warranted.  The Fund's Plan mostly follows the plan of distribution that the United States Securities and Exchange Commission (the "SEC") proposed for the Primary Fund, as adopted by this Court. (*See SEC v. Reserve,* 09 Civ. 4346, Dkt. #91.)  The Fund therefore devotes the balance hereof principally to addressing the few specific objections to the Plan.  As set forth below, such objections are either without merit, or can be accommodated with only minor revisions to the Plan.

---

[1]    An objection to the Plan was also submitted by non-parties Societe General, SG Americas, Inc. and SG North America, Inc. (Dkt. 118.)  The Fund will respond separately to SocGen's submission through the Fund counsel handling that matter.

## II.  DISTRIBUTION METHODOLOGY

The most significant departure from the SEC's plan for the Primary Fund is, of course, with respect to distribution methodology.  The SEC advocated a *pro rata* approach, whereas the Fund has remained strictly neutral on the subject, and its Plan provides only for a distribution "pursuant to the methodology approved by the Court."[2]  (Dkt. #72 at 4.)  Most of the submissions are directed to this one issue.  The Fund continues to take no position.

That said, the Fund does take great issue with certain of the premises advanced by investors in support of their respective positions.  On the *pro rata* side of the debate, several investors – Caxton perhaps most vociferously (Dkt. #120)[3] – level allegations against Fund management.  The Fund maintains, as it has throughout all of the cases involving this Fund and the related funds, that there has been absolutely no wrongdoing, and that such complaints are the product of 20-20 hindsight.  To the extent investors have lost a small percentage of their original investment, it was the unfortunate byproduct of the "unprecedented chaos surrounding the fall of Lehman" (*SEC v. Reserve,* 09 Civ. 4346,  Dkt. #90 at 26), with the balance of the loss due to the wasteful suits brought by a few investors in competing jurisdictions.

It is not necessary, however, to adjudicate any of these allegations in order to adjudicate the pro rata / FIFO dispute.  Rather, if this Court finds that equitable considerations may play a role in its distribution methodology (and, again, the Fund takes no position as to that), this Court can come to a *pro rata* conclusion based on the impracticality of setting an accurate N.A.V. for

---

[2]    Western Union complains that the Fund "appears to favor a *pro rata* distribution" by virtue of the Fund's reference to Western Union's preferred position as a "First In – First Out ('FIFO') Approach."  (Dkt. #122 at 2.)  In truth, the "FIFO" label has been applied merely as a shorthand, and was never intended to disparage Western Union's position.  That said, we believe the label is generally accurate.

[3]    Perhaps the most disingenuous accusation comes from Third Avenue International Value Fund, L.P., which claims "significant fraud."  (Dkt. #128 at 2.)  Third Avenue doubles as the lead plaintiff in the parallel putative class action involving the Primary Fund.

the Fund in the immediate aftermath of the Lehman bankruptcy filing, about which Fund management had no insider knowledge.  Indeed, any such findings would be both inappropriate and potentially prejudicial here, given that the allegations are disputed and unproven, that the Fund's individual managers are not parties to this action, and that related issues will be put to a jury trial later this year.  Whatever distribution methodology is adopted, the Fund requests that the Court arrive at it without crediting or adopting disputed allegations.  Fund management has undertaken great effort to bring this Fund into a position where it, too, can be wound up and investors paid.  In addition to bringing this action, management has operated the Fund without reimbursement for almost two years. These good deeds should not be punished.

The Fund also takes issue with those FIFO advocates who continue to insist that this Court must grant "comity" or "deference" to the decision of the British Virgin Islands court on this or any other issue.  This Court, in its April 29, 2010 Memorandum Opinion and Order, has already passed on this issue, finding that Bankruptcy Code Chapter 15 prevents this Court from granting comity or deference to the BVI liquidation proceeding.  (Dkt. #69 at 8-11, 22-27.)  That decision is law of the case, and the investors provide no basis to revisit it now, relying instead on pre-Chapter 15 comity cases that have zero relevance to the issue at hand.  Rather than burden the Court with duplicative briefing, the Fund refers to its prior submission on this subject, along with the Court's decision on the issue.  (Dkt. #38, 67, 69.)  The Fund does not mean by this to suggest a result – only that the Court must make its own determination.

### III.  PERMANENT INJUNCTION

Section 3 of the Plan provides for a permanent injunction against all claims alleging indemnifiable conduct against a Fund indemnitee (without opining on who is an indemnitee and specifically what conduct is indemnifiable). (Dkt. #72 at 4.)  The provision matches the language of the permanent injunction adopted by this Court with respect to the Primary Fund, except it has

an additional carve-out for any enforcement proceeding brought by the FSC.  (*Id.* at 5.)  The

proposed injunction is supported not only by the FSC but also by essentially every shareholder

who has offered a submission on the subject, except for Western Union.

Not even Western Union questions the Court's ability to grant the permanent injunction

sought by the Fund.  Indeed, in its April 29, 2010 Memorandum Opinion and Order, the Court

ruled that it "has the power to grant the injunctive relief sought by the fund."  (Dkt. 69 at 19.)

That power is grounded in two separate statutes: (a) 28 U.S.C. §1651(a), upon which this Court

based the same relief for the Primary Fund; and (b) 28 U.S.C. § 2361, which provides:

> In any civil action of interpleader or in the nature of
> interpleader under section 1335 of this title, a district court may
> issue its process for all claimants and enter its order <u>restraining</u>
> <u>them from instituting or prosecuting any proceeding in any State or</u>
> <u>United States court affecting the property, instrument or obligation</u>
> <u>involved in the interpleader action</u> until further order of the court.
> Such process and order shall be returnable at such time as the court
> or judge thereof directs, and shall be addressed to and served by
> the United States marshals for the respective districts where the
> claimants reside or may be found.
>
> <u>Such district court shall hear and determine the case, and may</u>
> <u>discharge the plaintiff from further liability, make the injunction</u>
> <u>permanent, and make all appropriate orders to enforce its</u>
> <u>judgment</u>.

(Emphases added.)

### A.    The Entire Plan Is Premised On A Permanent Injunction That Enjoins All Indemnifiable Claims

Notwithstanding the foregoing, Western Union argues that the injunction should be

limited to only those claims involving the "distribution methodology," thereby allowing all other

indemnifiable claims against the Fund indemnitees to go forward.  This would undermine the

entire purpose of the Plan, as these claims would have to be reserved for, not just for defense

costs, but also for ultimate indemnifiable damages, which would be chargeable against the Fund.

Since such claims could equal all investor losses in the Fund, no further distributions could take place until all such lawsuits were resolved.

This is exactly the reason the proposed injunction here has such overwhelming shareholder and FSC support.  As the SEC explained, in response to similar objections to the Primary Fund injunction:

> Key to the Commission's Plan is the curtailment of indemnifiable claims against the Fund and its Trustees. By distributing the *Res,* the Court effectively would decide shareholders' and others' claims on the Fund, so to let other actions against the Fund continue would be to permit suits against a Fund with no assets, or, alternatively, would lead to the hold-back of a special reserve that could otherwise be distributed. The creation of such a reserve would defeat the primary purpose of the Commission's Plan - to fairly and equitably return Fund assets to investors as soon as reasonably practicable.

(*See SEC v. Reserve,* 09 Civ. 4346,  Dkt. #140 at 18.)

Western Union offers no explanation as to why the same reasoning should not apply here. Instead, it offers only a baseless non sequitur as to how the "Directors should not be allowed to benefit themselves at the expense of former and current shareholders .…"  (Dkt. #122 at 10-11.) The irony here is that the only party that has blatantly sought to benefit itself at the expense of all of the other investors is Western Union which, unhappy with the prospect of this Court deciding the distribution issue, and with $12 million riding on the issue, went forum shopping down in the British Virgin Islands.  The liquidation proceeding it commenced has brought zero benefits and untold expense and delay to the remainder of the shareholders.  Now, it seeks to obstruct the one vehicle that promises to return investor assets promptly and fully.  Western Union's objection to the permanent injunction is without merit and should be disregarded.

**B.    The Issue Of A Possible Shareholder Vote
        To Extend the Injunction Is Not Ripe**

Other than neutrality as to the *pro rata* / FIFO issue, the only other material change from

the plan adopted for the Primary Fund is that this Plan empowers Fund shareholders to decide whether or not to retain non-indemnifiable claims, subject to Court approval. Certain investors have objected to this provision, but none have provided any authority for the proposition that such a shareholder vote would be *per se* illegal. As of now, no such shareholder vote has taken place, and so the issue is not ripe. Rather than rule on what is, at present, a hypothetical issue – *e.g.,* there is not even any proposed wording for such a resolution before the Court – the Fund requests that the Court defer consideration of this issue until a shareholder vote is taken. If, at that time, the resolution passes, the parties can then brief as to whether Fund shareholders have the legal right to collectively release non-indemnifiable claims.

Since the assets of Fund shareholders are what is ultimately at stake, the Fund believes that the shareholders are best situated to decide whether such assets are best spent defending questionable "fraud" claims by a couple of disgruntled shareholders, or instead returned to the shareholders in the form of a reduced Expense Fund. Should the shareholders so decide, the parties should have the opportunity to duly brief the issue at that time.

### C. State Street's Proposed Modifications To The Permanent Injunction Are Unnecessary And Inappropriate

State Street's objection to the Plan is a transparent effort to use the interpleader as a vehicle to win for itself a release well beyond that to which it is contractually entitled. State Street provides no basis for such a broad release, and none should be given. While State Street claims the Plan eliminates its contractual right to indemnification, in fact the Plan does just the opposite: it <u>preserves</u> State Street's indemnity. Section 3(c) provides that: "Nothing herein shall be deemed to enjoin or release any claims that any party may have against the Fund's custodian, State Street Bank and Trust Company, <u>except to the extent that such claims are wholly subject to indemnification by, and out of the assets of, the Fund</u>." (Dkt. #72 at 5.)

-6-

Indeed, the Plan provides the same scope of protection State Street received under the Primary Fund's plan.  (*See SEC v. Reserve,* 09 Civ. 4346,  Dkt. #91.)    When that plan was proposed by the SEC, State Street sought to obtain a release beyond the scope of its contractual rights, which excluded claims for State Street's negligence, arguing at the September 23, 2009 hearing that "all claims should be brought by the bar date, including negligence claims.  Any claim at all should be brought or it should be barred." (Tr. at 50.)  The Court disagreed, entering an order that limited the scope of State Street's injunction to those claims against State Street that "would be payable or subject to indemnification from the Primary Fund." *Id.*.

State Street is now trying the same thing again, and the Court should once again reject it.


## IV.  EXPENSE FUND

Certain of the Fund's investors, along with the FSC, have questioned the amount of the $25 million Expense Fund set pursuant to Section 5 of the Plan.  Western Union – joined (by the same counsel) by VeriSign – has also questioned the right of the Fund to set aside any funds <u>at all</u> to pay for present and future liabilities, and has demanded that all the Fund's remaining assets be distributed to shareholders without regard to liabilities. (Dkt. #122 at 10; #108).  As set forth below, there is nothing in either the Fund's governing documents nor under British Virgin Islands law that would justify such a radical departure from the approach advocated by the SEC and adopted by this Court with respect to the Primary Fund.  Rather, the governing documents and law both expressly <u>disallow</u> Western Union's demand.

A.    **The Fund's Governing Documents And British Virgin Islands Insolvency Law Both Expressly Require An Expense Fund**

We begin with Western Union's argument.  At the outset, it is noted that Western Union, with VeriSign, collectively represent less than 15% of the Fund.  (*See* Birch Decl. ¶ 2.)  The remaining 85% either endorses or does not contest the necessity for an Expense Fund of some amount.  The FSC – like the SEC and ultimately the Court with the Primary Fund – also endorses the concept of an Expense Fund, if not the specific amount proposed by the Fund in this case.  Even had they not, however, BVI law and the Fund's governing documents would still require it.  By contrast, Western Union points to no authority for its claim that the Fund may distribute assets to shareholders without properly reserving for liabilities.

The Fund's relationship to investors is governed by two key documents:  (a) the Offering Memorandum dated January 18, 2008 (the "Offering Memorandum");[4] which cross-references (b) the Amended and Restated Memorandum of Association & Amended Articles of Association dated January 21, 2009 ("Articles of Association").  (*See* Birch. Decl. Exhs. D, E.)

The Offering Memorandum disclosed to potential investors in relevant part that:

> The Fund will be responsible for all interest charges, taxes, brokerage fees and commissions, any extraordinary legal and accounting fees and any other extraordinary expenses, including any expenses incurred in connection with litigation proceedings and other claims and legal obligations of the Fund to indemnify its Directors, employees, shareholders, distributors and other agents.

(*See* Birch. Decl. Exh. D at 9, emphasis added.)  The Offering Memorandum further notified

---

[4]    The Fund issued a prior Offering Memorandum on March 2, 2006.  To the extent of the terms discussed herein, the 2006 Offering Memorandum is materially the same.

potential investors that:

> INDEMNIFICATION
>
> Among other things, <u>the Articles of Association of the Fund provide certain rights of indemnification in favor of Directors, officers</u> and liquidators of the Fund against legal liability and expenses if such persons have acted honestly and in good faith with a view to the best interests of the Fund, and, in the case of criminal proceedings, had no reasonable cause to believe that the conduct was unlawful.

*Id.* at 26 (emphasis added).

The Articles of Association, in turn, provide in relevant part:

> INDEMNIFICATION
>
> 143.  Subject to the limitations hereinafter provided, <u>the Company shall indemnify against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings any Person who</u>:
>
> (a) <u>is or was a party or is threatened to be made a party to any threatened, pending or completed proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the Person is or was a director, an officer or a liquidator of the Company</u>; or
>
> (b) is or was, at the request of the Company, serving as a director, officer or liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise.
>
> 144.  <u>The Company may only indemnify a Person if the Person acted honestly and in good faith with a view to the best interests of the Company</u> and, in the case of criminal proceedings, the Person had no reasonable cause to believe that his conduct was unlawful.
>
> 145.  The decision of the directors as to whether the Person acted honestly and in good faith and with a view to the best interests of the Company and as to whether the Person had no reasonable cause to believe that his conduct was unlawful, is, in the absence of fraud, sufficient for the purposes of these Articles, unless a question of law is involved.
>
> 146.  The termination of any proceedings by any judgment, order,

settlement, conviction or the entering of a nolle prosequi does not, by itself, create a presumption that the Person did not act honestly and in good faith and with a view to the best interests of the Company or that the Person had reasonable cause to believe that his conduct was unlawful.

147.  If a Person to be indemnified has been successful in defence of any proceedings referred to above, the Person is entitled to be indemnified against all expenses, including legal fees, and against all judgments, fines and amount paid in settlement and reasonably incurred by the Person in connection with the proceedings.

(*See* Birch. Decl. Exh. E at 28-29, emphases added.)

The indemnification obligations in paragraphs 143-47 above are valid under BVI law, and consequently represent a liability of the Fund.  *See* Birch Decl. Exh. F (Forte Decl. ¶ 6); *SEC v. Reserve,* 09 Civ. 4346,  Dkt. #140 at 23 (acknowledging that Primary Fund had "contractual obligations to pay litigation expenses of indemnified parties incurred in the successful defense of non-indemnifiable claims"); *Brewer v. Village of Old Field*, 311 F. Supp. 2d 382, 386  (E.D.N.Y. 2004) (holding that "an insurer must defend even if covered claims are dismissed by the Court leaving only non-covered claims remaining").

Not surprisingly, the Articles of Association make clear at several points that the Fund is required to withhold from shareholder distributions amounts sufficient to cover all present and reasonably anticipated future liabilities as they become due:

23.  No purchase, redemption or other acquisition of shares shall be made unless the directors determine that immediately after the purchase, redemption or other acquisition the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business ....

59.  No reduction of Capital shall be effected unless the directors determine that immediately after the reduction the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business ....

160.  No dividend shall be declared and paid unless the directors determine that, immediately after the payment of the dividend, the

-10-

> Company will be able to satisfy its liabilities as they become due in
> the ordinary course of its business ….

(*See* Birch. Decl. Exh. E at 8, 14, 31, emphases added.)

Tellingly, BVI law – like the Fund's governing documents – requires in an insolvency

process that a liquidator, like the Fund's directors, must reserve for liabilities such as indemnity

obligations before making payments to shareholders.  Specifically, as Mark J. Forte explains in

his accompanying Declaration, BVI Insolvency Rule § 191(1) (2005) provides that:

> In determining the funds available for distribution to creditors by
> way of dividend, the liquidator shall make provision (a) for any
> claims which creditors may not have had sufficient time to make;
> (b) for any claims which have not yet been determined; and (c) for
> any disputed claims.

(*See Birch* Decl. Exh. F (Forte Decl. Annex 1), emphasis added).)

As Mr. Forte further explains, what the Fund is achieving by way of a distribution under

Court supervision through the interpleader action is equivalent to a voluntary distribution under

the BVI Business Companies Act of 2004 (the "Act").  The same principle applies in the Act as

in Rule § 191(1), in that the Fund must always retain sufficient assets to cover liabilities.  Thus,

Western Union's suggestion that dissatisfaction with BVI law is what "motivated the Directors

to pursue the ill-suited interpleader" is completely unfounded.  (*Id.*)[5]

As the SEC recognized with the Primary Fund, and as the FSC and every shareholder

---

[5]      Western Union latches on to BVI Justice Bannister's statement that such a reserve is "wholly foreign to a liquidation carried out in accordance with the provisions of [BVI law]."  (Dkt. #122 at 10.)  Western Union has misconstrued the passage.  BVI Justice Bannister can be presumed to be familiar with BVI Insolvency Rule § 191(1) and the BVI Business Companies Act of 2004.  Thus, his words cannot have been intended to contravening those legal provisions.  Rather, as Mr. Forte explains in his accompanying declaration, what Justice Bannister was indicating was that the Fund would not have had any residual power to keep a fund separate from the assets available for distribution to all creditors by the liquidator.  [*See* Birch Decl. Exh. F, ¶7.)  In any event, as noted above, Justice Bannister's statement on this issue was mere dicta and, as this Court ruled, even the  actual holding is not entitled to comity or deference under Chapter 15.

other than Western Union recognizes here, the Fund must set aside sufficient reserves to "satisfy

its liabilities as they become due in the ordinary course of its business."  The only legitimate

question is how large that Expense Fund should be, in the event the Court adopts the permanent

injunction proposed in the Plan.  We address that issue next.

### B.       $25 Million Is An Appropriate *Initial* Amount For The Expense Fund

Setting a reserve for future liabilities is always an exercise in prognostication.  Under the

business judgment rule, Courts have traditionally been loath to interfere with the judgment

vested in management.  *See, e.g., Midland Sav. & Loan v. Dunmire*, 68 F.2d 249, 252 (10th Cir.

1933) ("We conclude that under the facts here presented the trial court should not have

substituted its judgment and discretion for that of the directors of the corporation with respect to

what was a reasonable reserve fund…"); *see also* Birch Decl. Exh. E at 23 ("The business and

affairs of the Company shall be managed by the directors.")   That is particularly appropriate

here, where the reserve is alleged to be too <u>high</u> – because once money is gone, it is gone.  This

Court recognized the impracticality of pursuing "claw back" actions against investors who got

more than their fair share. (*SEC v. Reserve,* 09 Civ. 4346,  Dkt. #90 at 41-44.) Yet here, certain

investors are advocating that the claims of future creditors be jeopardized, merely so that their

own distributions can be increased a fraction of a cent.  The Court should reject such demands,

and decline to second-guess the $25 million Expense Fund.

At the risk of stating the obvious, the Fund notes that the Expense Fund is not an

<u>expenditure</u> – it is merely a <u>reserve</u>.  Approximately 75-80% of the Expense Fund is a set-aside

for future liabilities which have not yet and may never occur. Moreover, the reserve itself is

ephemeral.  The Plan, like the plan adopted by this Court for the Primary Fund, establishes a

mechanism whereby the Monitor (or Court, if no Monitor is appointed) reviews all potential liabilities and modifies the Expense Fund accordingly.  (Dkt. #72 at 8-9.)

In this case, the Fund proposed an Expense Fund of $25 million.  This is based upon existing earned but unpaid management fees and Fund expenses of $5 million, and anticipated future administrative costs and legal and professional fees, in the event that Fund litigations drag on through 2014.  (*See* Birch Decl. Exh. F.)  The amount is conservative compared to the $83.5 million reserve agreed to by the SEC for the Primary Fund (which was on top of $10 million insurance proceeds).  (*SEC v. Reserve,* 09 Civ. 4346,  Dkt. #90 at 35-36.)  Admittedly, that is a much larger fund.  However, legal and professional fees rarely are strictly proportional to the size of the underlying matter or client.  Indeed, the proceedings surrounding this particular Fund have proven especially nettlesome and complex, with matters strewn across four Court systems in three different countries.

Even assuming a permanent injunction against all indemnifiable claims, the Expense Fund must be sufficient to cover potential defense costs for, *inter alia*: at least two state court trials; the claims against SocGen in New York State Supreme Court and the Cayman Islands Court to recover the $10 million frozen by SocGen; the appeal from the order appointing  the liquidators in the British Virgin Islands; any and all appeals from and/or challenges to the confirmed Plan, any proceedings the liquidators might think to bring in the future (should they ever conclude their review of the Fund's books and records); and any other claims any of the Fund's thousands of other shareholders might assert against Fund indemnitees in the future, a real possibility given some of the allegations raised in the submissions.

If anything, the various July 1, 2010 submissions reinforce the necessity of the $25 million.  In addition to the foregoing, we have now learned that the same $25 million must also serve as a reserve for a future $1 million legal fee claim from Caxton, and claims by State Street

-13-

of indeterminate amount.  (Dkt. #117 at 12-13; #105 at 5-6.)  (The Fund has also previously

opined that certain of the FSC's legal fees in mediating the liquidator dispute might also be

chargeable against the Fund.)  Indeed, State Street goes so far as to demand that the entire Plan

be reworked to provide that <u>nobody</u> gets paid another penny until the Court first determines just

how much to <u>increase</u> the Expense Fund in order to satisfy State Street.  (Dkt. #105 at 6.)   The

Fund opposes State Street's absurd demand, and further questions Caxton's claimed entitlement

to attorney's fees, particularly on application to Justice Kapnick.

That said, those claims are for another day.   For now, the Fund agrees that Section 5(c)

of the Plan can be modified as proposed by Caxton to clarify that the $25 million Expense Fund

also function as a reserve for future claims by other parties.  (Dkt. #117 at 13.)  That should be

sufficient to resolve State Street's concern as well.

## V.  REQUEST FOR MEDIATION

Lastly, two of the Fund investors in their submissions express a desire for the parties to

explore a negotiated resolution. (Dkt. #109, #110 at 1-2.)  The Fund shares this desire, and

continue to believe that a negotiated resolution has the potential to benefit all investors, in terms

of reduced administrative and legal fees and an earlier and complete return of investor assets.

Indeed, such discussions have been fruitful in the past.  The current Plan is a product of lengthy

negotiations with the FSC, and even the short-lived Cross-Border Protocol with the liquidators

showed potential for common agreement.  A negotiated resolution here could potentially resolve

not just the principal FIFO / *pro rata* dispute, but also the remaining issues to be determined by

the Monitor, such indemnification expenses, *etc*.  The Court will likely require some time after

the July 22, 2010 hearing to issue its decision, and so mediation could proceed concurrently

without delaying the overall process.

Accordingly, pursuant to Local Civil Rule 83.12(e), the Fund requests that the Court "determine that [this] case is appropriate for mediation and … order that case to mediation with or without the consent of the parties." To avoid delaying the interpleader process, the Fund further proposes that such non-binding mediation before a Magistrate Judge be held within two weeks following the July 22 hearing, and that the FIFO and *pro rata* camps each collectively designate one liaison party to represent their respective interests in the mediation, along with the Fund.

We thank the Court for its consideration.

Dated: New York, New York
      July 8, 2010

Respectfully submitted,

DUANE MORRIS LLP

By: *Fran M. Jacobs*
      John Dellaportas
      Fran M. Jacobs
1540 Broadway
New York, NY 10036
Tel: (212) 692-1012
*Attorneys for Interpleader*
*Plaintiff Reserve International*
*Liquidity Fund Ltd.*

-15-